UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

Mirada Del Lago, LLC,

No. 11-12-14204 TA

Debtor.

## MEMORANDUM OPINION

This matter came before the Court at the request of the Debtor and First American Bank ("First American") that the Court hold a separate hearing, prior to a hearing on confirmation of Debtor's plan of reorganization and/or First American's Motion to Dismiss or Convert, on the value of Debtor's real property. The Court held a final valuation hearing on May 22, 2013. Debtor was represented by its counsel David Hernandez. First American was represented by its counsel Sutin Thayer & Browne (Gail Gottlieb and Christopher Holland). Each party retained an appraiser, who testified and submitted an appraisal. Being sufficiently advised, the Court makes the following findings of fact and conclusions of law. This is a core matter.

I. BACKGROUND

1. Debtor filed this chapter 11 case on November 15, 2012.

2. Debtor owns a contiguous 180.2 acre parcel of real property in Sierra County, New Mexico (the "Property"). About 100.53 acres is

unimproved (the "Unimproved Tract"), while the balance is improved with a 31 lot subdivision (the "Improved Lots").[1]

3. The Property is on the southeast side of Elephant Butte Lake, about 8 miles east of Truth or Consequences, New Mexico.

4. The property is among a number of residential subdivisions clustered in the area, including Champagne Hills, Vista del Lago, Rancho del Lago, Estancias del Lago, and McRae Canyon.

5. The area has electric and telephone utility service, but no gas, water, or sewer service.

6. First American has a mortgage on the Property, securing a debt of about $1,172,327 as of the petition date.

7. First American filed a proof of claim on March 8, 2013 (claim 3-1), asserting a secured claim of $725,000.

8. There are unpaid pre-petition property taxes of about $29,141.05.

9. The Elephant Butte real estate market crashed in 2008, and has not yet recovered. Debtor's appraiser testified that real property such as the Property lost 70% of its value between October, 2008 and today. This was in part due to the fact that some of the demand for the lots is for second

---

[1] One lot has been sold, leaving 30 unsold lots.

homes, and the national market for second homes plunged and remains very weak.

10.     The population of Sierra County was 13,261 in 2000, and 11,988 on April 1, 2010, per the U.S. Census statistics.

11.     The U.S. Census estimates that Sierra County's 2012 population is about 11,895.

12.     Debtor seeks to retain the Property, reorganize, and then sell the Property post-confirmation lot by lot, paying First American's secured debt with the sales proceeds and obtaining partial lien releases when each sale is closed.

## II.     LEGAL STANDARDS

When valuing property pursuant to 11 U.S.C. § 506(a), the "'proposed disposition or use' of the collateral is of paramount importance . . . ." *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 962 (1997). *See also In re Heritage Highgate, Inc.,* 679 F.3d 132, 141 (3d Cir. 2012) (citing *Rash,* the Third Circuit stated that "the appropriate standard for valuing collateral must depend upon what is to be done with the property-whether it is to be liquidated, surrendered, or retained by the debtor). *See also* 11 U.S.C. § 506(a)(1) ("Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in

conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest").

In Chapter 11, if the debtor intends to retain a creditor's collateral, the proper value is fair market value, rather than liquidation or foreclosure value. *Heritage Highgate,* 679 F.3d at 142, citing *In re Winthrop Old Farm Nurseries*, 50 F.3d 72, 75 (1st Cir. 1995); *In re Adam Aircraft Industries, Inc.,* 2013 WL 773044 (D. Colo. 2013); *In re Castleton Plaza, LP,* 2011 WL 4621123 (Bankr. S.D. Ind. 2011); *In re Mayslake Village-Plainfield Campus, Inc.,* 441 B.R. 309 (Bankr. N.D. Ill. 2010) (the court used full fair market value or replacement value, because a chapter 11 debtor intended to retain and operate the property). In this case, there is no dispute that the proper way to value the Property is to determine its full fair market value, rather than using a liquidation, distressed sale, or similar discounted value.

11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f) provide that a properly filed proof of claim is entitled to prima facie validity. The debtor thus has the initial burden of proof to overcome the presumed validity and amount of the creditor's secured claim. *See Heritage Highgate,* 50 F.3d at 140; *In re Williams,* 381 B.R. 742, 744 (W.D. Ark. 2008). The burden then shifts to the creditor to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing the loan.

*Williams*, 381 B.R. at 744. Here, because First American filed a proof of claim asserting a secured claim of $725,000, Debtor has the initial burden of proof.

### III. GENERAL VALUATION ISSUES

Debtor retained Dr. Vincent Barrett, MIA to appraise the Property. Dr. Barrett was qualified as an expert witness by stipulation.[2]

First American retained Mr. Gareth Burman, MIA, MRICS, as its appraiser. Mr. Burman also was qualified as an expert witness by stipulation.

The appraisers agreed that the main driver of demand for the Property, and hence of value, would be new jobs and increased employment in Sierra County.

Sierra County has prospects for substantial employment growth, including Spaceport America, the Copper Flat Mine, and a Biofuels plant. These enterprises, combined, could generate thousands of jobs and cause a substantial increase in population and housing demand.

However, there is substantial uncertainty about whether any or all of

---

[2] Dr. Barrett had been retained by High Desert State Bank in June, 2008 to appraise the Property. He appraised it for $5,874,000 ($3,500,000 for the Improved Lots, and $2,374,000 for the Unimproved Tract). High Desert was closed by the federal regulators, and First American acquired the subject loan. First American retained Dr. Barrett to appraise the Property in October, 2010. He appraised it for $4,243,000 ($3,055,000 for the Improved Lots, and $1,188,000 for the Unimproved Tract).

these enterprises will actually materialize, how many jobs would be produced by these (or other) enterprises, and when hiring would begin.

Primarily but not solely because of the market crash, there are very few comparable sales available for use to help determine the current fair market value of the Property. For example, there have been six lot sales in the vicinity in the last five years, and only two lot sales in the last three years.

The Court finds that appraisal of the Property is substantially more difficult than a typical appraisal, given the lack of comparable sales, lack of current demand, and the extent to which speculative job growth determines value. These difficulties probably are the main reasons for the wide difference between the values arrived at by the appraisers (Barrett's $1,690,000 value is about 233% higher than Burman's $725,000 estimate).

## IV.    THE IMPROVED LOTS

Dr. Barrett opined that the Improved Lots are worth $988,000. Mr. Burman's view is that the lots are worth $474,000.

Dr. Barrett opined that the average value of the Improved Lots is $60,785, or about $.63 per square foot. His method of arriving at this value was somewhat complicated, and involved the use of a linear regression analysis, using two sets of data. The first data set was information from

-6-

(supposedly) comparable sales. Dr. Barrett's linear regression analysis on this data set resulted in a high projected value for the Improved Lots: $110,360 per lot, or $1.106 per square foot. However, this data set included sales before 2010 (including some sales from 2006), as well as property listed for sale but not sold. The Court does not know what the result would have been had the analysis been conducted without using sales that do not appear to be comparable, and without using lists prices rather than actual sales prices.

Dr. Barrett's second linear regression analysis used data for all lot sales in the area between April 19, 2008 and April 19, 2013. Again, these sales do not appear to be comparable because, inter alia, the undisputed testimony was that the market value of similar lots in Sierra County declined by about 70% between 2008 and 2012, so the older sales would have to be substantially adjusted. It is not clear that they were. Furthermore, there is no indication whether the lots sold were comparable in terms of location, view, utilities, terrain, or other features typically adjusted for in the appraisal process.

Mr. Burman opined that the average value of the Improved Lots is $47,167, or about $.49 per square foot. To arrive that this estimate, Mr. Burman used two sales, an 11.41 acre lot in Estancias del Lago, which sold

-7-

for $70,000 in August 2012,[3] and a 3.95 acre lot in Champagne Hills that sold in May, 2010 for $57,000. The 11.41 acre lot does not have a view of Elephant Butte Lake. It is not clear to the Court how comparable an 11 acre parcel without lake views is to a 2.3 acre parcel with lake views. Similarly, the 3.95 acre lot in Champagne Hills may or may not be comparable, but it is undisputed that there is an arroyo running through the middle of the property, which likely has a substantial negative effect on its value. Furthermore, while Mr. Burman concludes that "lots with good views or acreage have a value in the $50,000 range," he made downward adjustments to most of Debtor's lots based on size or location. Mr. Burman's adjustments may have been accurate and justifiable, but it is not possible for the Court to say, because the precise method and rationale for deciding the size of the adjustments was not disclosed.

Having arrived at their different current values, the appraisers agreed that the proper next step is to estimate how long it would take to sell the lots to retail customers (the "absorption period"). After estimating the absorption period, both appraisers then deducted estimated sales and other costs, and discounted the projected net proceeds to present value.

---

[3] The seller, Robert Janes, is an insider of Debtor, and may have obtained the lot in payment of attorney fees, so there is some reason to wonder whether the sale was typical and should have been relied upon so heavily.

-8-

The appraisers apparently agreed that an appropriate present value discount rate is about 19-20%.[4]

The appraisers disagree about how long it would take Debtor to sell the Improved Lots. Dr. Barrett estimates that Debtor could sell the lots in four and a half years, or by the end of 2017, with all but two lots sold by the end of 2016, and 26 lots sold between 2014-2016.

Mr. Burman, on the other hand, is of the opinion that it would take about eight years to sell the lots, with 26 of the sales occurring in 2017-2021.

The difference in the projected absorption period results in much of the difference in the appraisers' opinion about the value of the Improved Lots.

## V. THE UNIMPROVED TRACT

Dr. Barrett valued the Unimproved Tract at $6,500 per acre, for a total value of $702,000. However, at the hearing it was established that the actual size of the Unimproved Tract is about 100.5 acres rather than the 108.04 acres Dr. Barrett assumed, so Dr. Barrett's value has to be decreased by $49,010, to $652,990.

---

[4] Dr. Barrett's discount rate was 15%, but he also deducted for "entrepreneurial profit." Mr. Burman testified that he recalculated Dr. Barrett's present value analysis to determine what the analogous discount rate would be if the entrepreneurial profit line item were eliminated. Mr. Burman testified that the resulting rate was 19%. This testimony was not questioned or contradicted by Debtor or Dr. Barrett.

Dr. Barrett arrived at his per acre figure by using 12 comparable sales, which ranged from $1,538 to $17,686 per acre. Dr. Barrett adjusted the sales prices using an undisclosed process. Of the six comparables with a higher per acre price than $6,500, four were sold in 2007 or 2008, one is a listing rather than a sale, and one is in downtown Truth or Consequences and was purchased to build a hospital. Of the six comparables with a lower per acre value, three are listings.

Mr. Burman valued the Unimproved Tract at $251,000, or $2,500 per acre. He reached his opinion by using the same 11.4 acre parcel he used for the Improved Lots, which may be questionable (it seems unlikely that the same lot can be comparable to both a 2.3 acre improved residential lot and a 100 acre unimproved tract), together with two sales of large tracts in 2010 and 2011. There is no discussion whether these two tracts are comparable to the Unimproved Tract, and/or what adjustments Mr. Burman made to those sales to arrive at a value for the Unimproved Tract.

Overall, the Court finds that appraisers' respective methods for determining the per acre value of the Unimproved Tract can be questioned. However, it is likely that the dearth of good, recent comparable sales is largely to blame.

Dr. Barrett and Mr. Burman agree that future job growth is an

important factor in the value of the Unimproved Tract, because the highest and best use of the tract is residential development, and the value of future residential lots is based on housing demand fueled by job and population growth.

## VI. DISCUSSION

The main difference in the appraisals is the difference in opinion about future job growth in Sierra County. Dr. Barrett's estimate of value is based primarily on optimistic assumptions about relatively large numbers of jobs to be created by the Spaceport, the Copper Flat mine, and the Biofuel plant. Mr. Burman's valuation, on the other hand, is based on the assumption that those jobs will not materialize at nearly the numbers or timetable Dr. Barrett projects.

The Court finds that, if the Spaceport "takes off" soon, or if one or both of the other big projects begins operations in the near future, Dr. Barrett's $1,640,990 value[5] could be realistic. On the other hand, if the projects do not materialize as hoped, or are substantially delayed, then Mr. Burman's more pessimistic $725,000 value could be more accurate. Given the inherent difficulty of making accurate predictions about future economic

---

[5] Dr. Barrett's original figure of $1,690,000, less $49,010 (7.54 acres X $6,500 per acre).

-11-

growth,[6] it is not easy to evaluate the likelihood that Dr. Barrett's rosy economic forecast could be realized.  *See generally Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (valuation based on necessary prediction of what will happen in the future, an estimate is all that can be made); *Muskegon Motor Stockholders Protective Committee v. Davis,* 366 F.2d 522 (6th Cir. 1966) (citing *Consolidated Rock Products* and stating that "the valuation of a business remains an art based on the use of informed, careful judgment (including that of the court), and it cannot be expected to yield mathematically precise results").

Nevertheless, the Court must make a finding of value.  Based on the evidence presented at the final hearing, the Court finds that there is a 1/3 chance of Dr. Barrett's optimistic result being accurate, and a 2/3 chance of Mr. Burman's pessimistic result being accurate.  The Court therefore elects to find a value for the Property that is a weighted average of the two appraised values, with 2/3 of the weight given to Mr. Burman's value.

The result is a value of the Property of $1,030,330.  In addition, to the extent it may be needed at a future hearing, the Court finds that 62% of this figure is the value of the Improved Lots ($638,804.60), and 38% is the value

---

[6] "Prediction is very difficult, especially about the future."  Neils Bohr (Danish physicist (1885-1962)).

of the Unimproved Tract ($391,525.40).[7]

## VII. CONCLUSION

The Court finds that the value of the Property is $1,030,330, comprised of $638,804.60 for the Improved Lots and $391,525.40 for the Unimproved Tract. A separate order will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered on docket: May 28, 2013

Copies to:

Gail Gottlieb
Sutin, Thayer & Browne
P.O. Box 1945
Albuquerque, NM 87103-1945

David N Hernandez
2221 Rio Grande Blvd. NW, #100
Albuquerque, NM 87104

Leonard K Martinez-Metzgar
P.O. Box 608
Albuquerque, NM 87103-0608

---

[7] Dr. Barrett assigned about 58% of his total value to the Improved Lots, while Mr. Burman assigned 65% of his total value to the Improved Lots.